```
                    UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
                           WESTERN DIVISION
```

HARDY WILSON MEMORIAL
HOSPITAL, et al.,                                            PLAINTIFFS

VERSUS                              CIVIL ACTION NO. 5:08cv4-DCB-JMR

MICHAEL O. LEAVITT, Secretary,
United States Department of Health
and Human Services, et al.,                                   DEFENDANTS

## OPINION AND ORDER

This cause is before the Court on the parties' cross-motions for summary judgment [document entry nos. 10, 13]. The Court, having considered the motions, the responses thereto, all applicable statutory and case law, and being otherwise fully advised in the premises, finds and orders as follows:

The plaintiffs in this case are Hardy Wilson Memorial Hospital, Sharkey-Issaquena Community Hospital, Alliance Healthcare Systems, Inc., Jefferson County Hospital, and Claiborne County Hospital (collectively "plaintiffs" or "providers"), all of which are acute-care hospitals enrolled and participating in the federal Medicare program. The suit, in which the plaintiffs seek declaratory and injunctive relief, is brought against Michael O. Leavitt in his official capacity as Secretary of the United States Department of Health and Human Services (HHS) and Kerry N. Weems in his official capacity as Acting Administrator of the Centers for

Medicare and Medicaid Services (CMS).[1] Specifically, the plaintiffs ask the Court to review CMS's method of calculating the reimbursements payable to them under the Medicare program for certain psychiatric services rendered to Medicare beneficiaries in fiscal years 2003, 2004, and 2005.

## I. OVERVIEW OF RELEVANT STATUTES AND REGULATIONS

Hospitals participating in the Medicare program generally are compensated pursuant to the program's Prospective Payment System (PPS), whereby providers are paid a fixed amount for services rendered to each patient. However, some categories of providers, including the plaintiffs herein, once were excluded from the PPS and were paid pursuant to a reimbursement program first enacted in Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA).[2] Providers paid under this reimbursement program, rather than receive a fixed amount of payment for services they provided, were

---

[1] The Centers for Medicare and Medicaid Services (CMS) is the agency within the United States Department of Health and Human Services (HHS) that is responsible for administering the Medicare program. For easier readability, the Court will refer to the defendants collectively as CMS throughout this opinion.

[2] Congress since has enacted the Balanced Budget Refinement Act of 1999 (BBRA) (Pub. L. 106-113), which required CMS to implement a prospective payment system (PPS) for inpatient psychiatric facilities. The PPS for inpatient psychiatric facilities was scheduled to become effective for cost reporting periods beginning on or after October 1, 2002. However, the new system did not go into effect until 2005. 72 Fed. Reg. 25,602, 25, 603 (May 4, 2007). The dispute in this case concerns the reimbursements paid during the interim period between the scheduled end of the reimbursement program and the actual start of the new prospective payment program.

2

compensated based on the reasonable costs of the medical services they provided to Medicare beneficiaries.

Under the reimbursement program, each provider's annual amount of reimbursement was based on a "target amount" as determined by law. Since the method of calculating a provider's "target amount" is the central issue in this case, the Court reviews the history of the relevant statutory provisions.

### A. The Initial "Target Amount" (pre-1998)

When it developed the reimbursement program, Congress expressly defined "target amount" in 42 U.S.C. § 1395ww(b)(3)(A), which reads, in relevant part:

> ...[F]or purposes of this subsection, the term "target amount" means, with respect to a hospital for a particular 12-month cost reporting period--
>
> > (i) in the case of the first such reporting period for which this subsection is in effect, the allowable operating costs of inpatient hospital services (as defined in subsection (a)(4) of this section) recognized under this subchapter for such hospital for the preceding 12-month cost reporting period, and
> >
> > (ii) in the case of a later reporting period, the target amount for the preceding 12-month cost reporting period,
>
> increased by the applicable percentage increase under subparagraph (B) for that particular cost reporting period.

In turn, CMS issued regulations implementing Congress' definition of target amount. First, CMS regulations broadly define "target amount" as "the per discharge (case) limitation, derived

3

from the hospital's allowable net Medicare inpatient operating costs in the hospital's base year, and updated for each subsequent hospital cost reporting period by the appropriate annual rate-of-increase percentage." 42 C.F.R. § 413.40(a)(3). This definition, although it indicates that the target amount is "derived from" a hospital's allowable operating costs, is not exact as to how that target amount is to be calculated. To address "target amount" more specifically, CMS issued additional regulations instructing its intermediaries[3] on the method by which a hospital's target amount is to be calculated. At that time, 42 C.F.R. § 413.40(c)(4)(i)-(ii) calculated a hospital's target amount using the following method:

> (4) Target amount. The intermediary will establish a target amount for each hospital. The target amount for each cost reporting period is determined as follows:
>
> (i) For the first cost reporting period to which this ceiling applies, the target amount equals the hospital's allowable net inpatient operating costs per case for the hospital's base period increased by the update factor for the subject period.
>
> (ii) For subsequent cost reporting periods, the target amount equals the hospital's target amount for the previous cost reporting period increased by the update factor for the subject cost reporting period, unless the provisions of paragraph (c)(5)(ii) of this section apply.

42 C.F.R. § 413.40(c)(4)(i)-(ii) (1990).

The Second Circuit Court of Appeals clearly summarized this

---

[3] Fiscal intermediaries are private contractors employed by CMS to administer its Medicare reimbursement program.

4

process in Rye Psychiatric Hospital Center, Inc. v. Shalala, 52 F.3d 1163, 1166 (2d Cir. 1995):

> The initial step in fixing a TEFRA hospital's entitlement to reimbursement, generally speaking, is to determine its total "allowable costs" for a base year. Reimbursements in subsequent years, however, do not depend on total or allowable costs incurred in those subsequent years. Rather, a maximum permissible reimbursement, or "target amount," for each subsequent period is established by multiplying the figure for the base year by a legislatively determined percentage. If a hospital expends more than its target amount, or ceiling, it is reimbursed only up to the amount of the ceiling. If its costs are less than the ceiling, it is given a bonus payment of half the difference between its costs and the ceiling.

Id. This procedure was followed consistently until 1997.

## B. "Target Amount" During the Time of the BBA Cap Provisions (1998-2002)

In 1997, Congress enacted the Balanced Budget Act of 1997 (BBA), which put in place cap provisions that further limited the amount of compensation payable to certain Medicare providers. Specifically, Congress added subsection (H) to 42 U.S.C. § 1395ww(b)(3). That new subsection reads:

> (i) In the case of a hospital or unit that is within a class of hospital described in clause (v), for a cost reporting period beginning during fiscal years 1998 through 2002, the target amount for such a hospital or unit may not exceed the amount as updated to or for such cost reporting period under clause (ii).
>
> (ii)(I) In the case of a hospital or unit that is within a class of hospital described in clause (iv) [which includes the plaintiff hospitals herein], the Secretary shall estimate the 75th percentile of the target amounts for such hospitals within such class for cost reporting periods ending during fiscal year 1996, as adjusted under clause (iii).

> (II) The Secretary shall update the amount determined under subclause (I), for each cost reporting period after the cost reporting period described in such subclause and up to the first cost reporting period beginning on or after October 1, 1997, by a factor equal to the market basket percentage increase.
>
> (III) For cost reporting periods beginning during each of fiscal years 1999 through 2002, subject to subparagraph (J), the Secretary shall update such amount by a factor equal to the market basket percentage.

42 U.S.C. § 1395ww(b)(3)(H)(i-ii). In short, the effect of this new subsection was that, for fiscal years 1998 through 2002, the target amounts for certain types of hospitals, including the plaintiffs' hospitals, could not exceed the 75th percentile of target amounts for all hospitals in its class of providers.

In response, CMS revised its regulations concerning the method by which these hospitals' target amounts were to be calculated. Specifically, CMS added paragraph (iii) to its existing regulation, 42 C.F.R. § 413.40(c)(4). The version of the regulation effective at the time involved in this case reads, in pertinent part:

> In the case of a psychiatric hospital or unit ... the target amount is the lower of the amounts specified in paragraph (c)(4)(iii)(A) or paragraph (c)(4)(iii)(B) of this section.
>
> (A) The hospital-specific target amount.
>
> > (1) In the case of all hospitals and units, except long-term care hospitals for cost reporting periods beginning during FY 2001, the hospital-specific target amount is the net allowable costs in a base period increased by the applicable update factors.

***

(B) One of the following for the applicable cost reporting period--

(1) For cost reporting periods beginning during fiscal year 1998, the 75th percentile of target amounts for hospitals in the same class (psychiatric hospital or unit, rehabilitation hospital or unit, or long-term care hospital) for cost reporting periods ending during FY 1996, increased by the applicable market basket percentage up to the first cost reporting period beginning on or after October 1, 1997.

(2) For cost reporting periods beginning during fiscal year 1999, the amount determined under paragraph (c)(4)(iii)(B)(1) of this section, increased by the market basket percentage up through the subject period, subject to the provisions of (c)(4)(iv) of this section.

(3) For cost reporting periods during fiscal year 2000--

(i) The labor-related portion and the nonlabor-related portion of the wage-neutralized 75th percentile of target amounts for hospitals in the same class [ ] for cost reporting periods ending in FY 1996, are increased by the applicable market basket percentage up to the first cost reporting period beginning on or after October 1, 1999.

*\*\**

(4) For cost reporting periods beginning during fiscal years 2001 through 2002--

(i) The amounts determined under paragraph (c)(4)(iii)(B)(3)(i) of this section are: increased by the market basket percentage up through the subject period ...

7

42 C.F.R. § 413.40(c)(4)(iii)(A-B) (2004)[4]. The result of these amendments was that, during the period to which the BBA cap provisions applied (1998-2002), a hospital's final target amount would be one of two amounts. The first possible target amount was the hospital's individual target amount according to pre-BBA calculations, i.e., the amount of allowable expenses from the base period year adjusted forward to the current year ("hospital-specific amount"). The second potential target amount was the maximum amount allowed under the BBA, i.e., an amount not to exceed the 75th percentile of target amounts for all hospitals in the class ("capped amount"). Pursuant to CMS regulations, a provider's final target amount was the lower of either the "hospital-specific amount" or the "capped amount", as described above. For the providers in this case, the BBA capped amount was greater than their hospital-specific amounts, so the BBA provisions resulted in significantly lower reimbursements for them. This procedure was followed consistently until 2002.

*C. The Instant Case: "Target Amount" After Expiration of the BBA Cap Provisions (2003-2005)*

In 2002, the BBA cap provisions expired. At that time, CMS was not prepared to transition into Congress' newly-mandated

---

[4] Effective October 1, 2005, an introductory phrase was added to 42 C.F.R. § 413.40(c)(4)(iii) which specified that the entire section was to apply "[f]or cost reporting periods beginning on or after October 1, 1997 through September 30, 2002." 42 C.F.R. § 413.40(c)(4)(iii) (2008). During the periods of time at issue in this case, however, that introductory language was not present.

8

Prospective Payment System (PPS)[5]. The instant litigation arises out of CMS's method of calculating a provider's target amount during this interim period between expiration of the BBA cap provisions and implementation of the newly-mandated PPS.

The five plaintiff hospitals herein--Hardy Wilson Memorial Hospital, Sharkey-Issaquena Community Hospital, Alliance Healthcare Systems, Inc., Jefferson County Hospital, and Claiborne County Hospital--are all providers who participated in Medicare's reimbursement program. The same fiscal intermediary, TriSpan Health Services, was responsible for handling the reimbursements to the five plaintiff hospitals in this case.

Prior to implementation of the BBA cap scheme, TriSpan calculated the providers' reimbursements using 42 C.F.R. § 413.40(c)(4)(ii), which set each hospital's target amount equal to its target amount for the previous cost reporting period increased by the applicable update factor. The result of this method was that each hospital had a unique target amount that was derived from its own allowable costs. From 1997 to 2002, when the BBA cap provisions were in effect, TriSpan, in accordance with 42 C.F.R. § 413.40(c)(4)(iii), calculated each provider's target amount using the lesser of either (1) the hospital's specific target amount (derived from its individual allowable costs) or (2) the maximum amount under the BBA, i.e., an amount not to exceed the 75th

---

[5] See, supra, note 2.

percentile of target amounts for all hospitals in the class.  The providers do not dispute TriSpan's calculations for target amounts prior to 2003.

In 2003, after the BBA cap provisions expired, the providers submitted to TriSpan their cost reports for reimbursement.  In preparing their 2003 reports, the providers calculated their reimbursements using their "hospital-specific" target amounts according to 42 C.F.R. 413.40(c)(4)(iii).  TriSpan rejected these figures.  Instead, TriSpan calculated the providers' reimbursements pursuant 42 C.F.R. § 413.40(c)(4)(ii) and calculated the FY 2003 target amounts using the target amount actually applied to the providers in FY 2002, which for each of these providers was the BBA capped amount.  The providers dispute TriSpan's calculations, arguing that by basing their FY 2003 target amounts on the FY 2002 capped amount, CMS has impermissibly extended the impact of the BBA cap provisions beyond their 2002 expiration date.

An example will be helpful to understand the situation.  The following figures are those of Hardy-Wilson Memorial Hospital, one of the plaintiffs herein, and were taken from the plaintiffs' motion for summary judgment.  (Pls.' Mot. for Summ. J. at 6.)

| Fiscal Year | Hospital-Specific Target Amount | Capped Amount Under the BBA | Final Target Amount Used to Calculate Reimbursement |
|---|---|---|---|
| 1997 | $25,330.72 | n/a | $25,330.72 |
| 1998 | $25,330.72 | $10,534.00 | $10,534.00 |

10

| 1999 | $25,337.58 | $10,787.00 | $10,787.00 |
| 2000 | $25,507.64 | $8,870.71  | $8,870.71  |
| 2001 | $25,752.51 | $9,323.93  | $9,923.93  |
| 2002 | $25,958.53 | $9,696.35  | $9,696.35  |
| 2003 | $26,867.08 | n/a        | $10,035.72 |

These figures highlight the difference between the two positions. From the providers' viewpoint, the amount used to calculate reimbursements in 2003 and later years should have been the hospital-specific target amounts (the amounts in the second column above), which were calculated using each provider's reasonable costs in the base year and trending those amounts forward using a standard update factor. Stated differently, the providers assert that their target amounts are always equal to the number from the second column and that the BBA cap provisions, applicable only in fiscal years 1998 to 2002, only placed a limit on that number, but did not change the fact that a hospital's "target amount" equals its hospital-specific allowable costs from the base year trended forward to the current year. CMS contends, however, that a hospital's "target amount" is the number from the fourth column above, the number actually applied to a provider in a given year, regardless of whether that number was the hospital-specific amount or the capped amount. Thus, according to CMS, when a provider is subjected to the cap provisions, the capped amount actually becomes that hospital's "target amount" for purposes of calculating its subsequent year's reimbursement. Accordingly, CMS

11

claims that it acted appropriately by basing the providers' 2003 target amounts (and subsequent target amounts) on the previous amount that was actually applied to each provider. The impact is obvious. Under CMS's method, providers received substantially smaller reimbursements than they would have absent the continued effect of the cap provisions.

The providers appealed to the Provider Reimbursement Review Board ("PRRB"). In their appeal, the providers sought review of TriSpan's calculation of their reimbursements for FY 2003, FY 2004, and FY 2005. On November 17, 2007, the PRRB concluded that, since the providers' appeal required a decision on the legality of CMS's regulations and its interpretation thereof, it lacked authority to decide the case. After the PRRB granted their request for expedited judicial review, the providers filed suit in this Court on January 15, 2008.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is apposite "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).[6] The party

---

[6] "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law. An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party." Ginsberg 1985 Real Estate Partnership v. Cadle Co., 39 F.3d 528,

12

moving for summary judgment bears the initial responsibility of apprising the district court of the basis for its motion and the parts of the record which indicate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

"Once the moving party presents the district court with a properly supported summary judgment motion, the burden shifts to the nonmoving party to show that summary judgment is inappropriate." Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). But the nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Moreover, "[t]he mere existence of a scintilla of evidence is insufficient to defeat a properly supported motion for summary judgment." Anderson, 477 U.S. at 252. The nonmovant must instead come forward with "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). Summary judgment is properly rendered when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of

---

531 (5th Cir. 1994) (citations omitted).

13

proof at trial." Celotex Corp., 477 U.S. at 322.

### III.  ANALYSIS

At issue in this case is whether CMS's method for calculating a provider's target amount for fiscal years 2003, 2004, and 2005[7] is a permissible one.  The Court begins by outlining the standard governing its review of an agency decision.

When reviewing an agency's interpretation of a statute it is charged with administering, the Court employs a two-step test in accordance with Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).  Medical Center Pharmacy v. Mukasey, 536 F.3d 383, 393 (5th Cir. 2008).  In the first step, the Court asks "[w]hether Congress has directly spoken to the precise question at issue."  Id. (quoting Chevron, 467 U.S. at 842).  If the answer is yes, the inquiry is over and the Court follows Congress' direction.  Id.  Indeed, "if the language is unambiguous on its face, then the first canon is also the last: judicial inquiry is complete."  Miss. Poultry Association, Inc. v. Madigan, 992 F.2d 1359, 1363 (5th Cir. 1993) (internal quotations omitted).

If, however, Congress has not clearly spoken, the statute is considered ambiguous and the Court proceeds to the second step. Medical Center Pharmacy, 536 F.3d at 393.  Under the second step, the Court "defer[s] to any 'permissible construction of the

---

[7]  This is time period between the expiration date of the BBA cap provisions and the effective date of the new prospective payment system as described in footnote 1 of this order.

14

statute' by the agency." Id. A court should reverse an agency's interpretation of an ambiguous statute only if it is "arbitrary, capricious, or manifestly contrary to the statute." Chevron, 467 U.S. at 844.

*A. Are the Relevant Statutory Provisions Ambiguous?*

The Court now turns to the first step of Chevron--determining whether Congress has spoken to the exact issue at hand. Chevron, 467 U.S. at 842. In several areas of the Medicare reimbursement scheme, Congress provided clear instructions to CMS on how to handle reimbursements to its providers. First, Congress expressly defined "target amount" in 42 U.S.C. § 1395ww(b)(3)(A) as, for the first year, a hospital's allowable costs of operation and, for subsequent years, the amount from the preceding 12-month period updated by a standard factor. Later, Congress imposed specific caps on the providers' target amounts for fiscal years 1998 through 2002. Finally, Congress expressly directed CMS to discontinue the reimbursement program and to implement a new prospective payment system, effective upon expiration of the BBA's cap provisions. What Congress did not provide, however, were instructions for CMS to follow in the event of a delay between expiration of the BBA's cap provisions and implementation of the new PPS. Without express direction from Congress, CMS was left to decide how to calculate a hospital's target amount during this interim period. Accordingly, the Court concludes that the statute is silent and, therefore,

15

ambiguous.

   *B. Is CMS's Interpretation Entitled to Deference?*

In light of the ambiguity of the relevant statutes, the Court next examines whether CMS's actions are entitled to deference. See El Paso Elec. Co. v. F.E.R.C., 201 F.3d 667 (5th Cir. 2000) (citing Chevron, 467 U.S. at 843). As a reminder, deference is due unless the Court determines that the agency's construction is "'arbitrary, capricious, or manifestly contrary to the statute.'" Tex. Coalition of Cities for Utility Issues v. F.C.C., 324 F.3d 802, 807 (5th Cir. 2003) (quoting Chevron, 467 U.S. at 842-32)).

First, CMS's position is not "manifestly contrary to the statute". Id. Indeed, the method used to calculate the providers' reimbursements for the years in question is in line with Congress' only express definition of a target amount. 42 U.S.C. § 1395ww(b)(3)(A)(ii) (defining target amount for any year after the base year as ". . . the target amount for the preceding 12-month cost reporting period, increased by the applicable percentage increase"). The providers do not dispute their target amounts for 2002 or earlier. For fiscal year 2003, CMS calculated a provider's target amount to be the same as for 2002 updated by the applicable percentage increase. The same method was used for 2004 and 2005, updating each prior year respectively. The fact that these amounts are derived from the capped amounts rather than the providers' individual costs does not make CMS's actions at odds with the

16

statutory language.

Nor is the agency's position "arbitrary" or "capricious". Id. CMS's actions are not only supported by the relevant statutory language, but they are also in line with CMS's own regulation, 42 C.F.R. § 413.40(c)(4)(ii). That regulation, which directly implements Congress' long-standing definition of "target amount", instructs that a hospital's target amount is equal to "the hospital's target amount for the previous cost reporting period increased by the update factor". 42 C.F.R. § 413.40(c)(4)(ii).

The plaintiffs challenge the agency's reliance on subsection (ii) of 42 C.F.R. § 413.40(c)(4), arguing instead that their target amounts should be calculated using subsection (iii) of that regulation, which sets a provider's target amount as the lower of its hospital-specific target amount under subsection (A) or the BBA capped amount under subsection (B). According to the providers, subsection (B) expired in 2002 when the cap provisions of the BBA expired, leaving CMS only one option--to refer to subsection (A) and apply a hospital's specific target amount.

In opposition, CMS argues that subsection (iii) was only promulgated to give effect to the BBA's cap provisions and that, as such, when the cap provisions expired in 2002, so did subsection (iii). The result, according to CMS, was that the providers who were previously affected by subsection (iii) once again were governed pursuant to subsection (ii), which based the providers'

17

target amounts on their target amounts from the previous cost reporting period, regardless of the method by which the previous target amounts were calculated.

This dispute requires the Court to review CMS's interpretation of its own regulations. The Court "must defer to the Secretary's interpretation unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation'." Thomas Jefferson University v. Shalala, 512 U.S. 504, 512 (1994)(quoting Gardebring v. Jenkins, 485 U.S. 415, 430 (1988)).[8]

The agency, at the expiration of the cap provisions, was faced with a decision. Was it required to continue the implementation of subsection (iii), which was designed specifically to address the cap provisions mandated by Congress, or was CMS permitted to return to subsection (ii) and logically conclude that subsection (iii) expired with the expiration of the cap provisions? While it is true that the expiration of subsection (iii) was not bootstrapped to the expiration of the cap provisions, it is reasonable for the agency to conclude that subsection (iii) had a specific purpose which expired simultaneously with the expiration of the cap provisions. Furthermore, with the expiration of subsection (iii),

---

[8] See also Thomas Jefferson University, 512 U.S. at 512 (quoting Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 697 (1991)) (noting that when the regulation concerns "'a complex and highly technical regulatory program'", broad deference to the agency's interpretation is even more warranted).

it is reasonable for CMS to revert to subsection (ii) in the absence of further statutory mandate.

## IV. CONCLUSION

In sum, CMS acted to fill a void left by Congress. Since its action was not arbitrary, capricious or manifestly contrary to the statute and was in line with its own regulatory scheme, deference to the agency's action is proper. Summary judgment in favor of CMS is granted.

After filing their cross-motions for summary judgment, the parties herein provided to the Court information on a related decision, Arkansas State Hospital v. Leavitt, 2008 WL 4531714 (E.D. Ark. Oct. 8, 2008). Having independently considered the facts of the instant case and all applicable law, this Court is in agreement with the result reached by United States District Court Judge Brian Miller in Arkansas State Hospital.

## V. ORDER

Accordingly,

**IT IS HEREBY ORDERED** that plaintiffs' Motion for Summary Judgment [docket entry no. 10] is **DENIED**.

**IT IS FURTHER ORDERED** that defendants' Motion for Summary Judgment [docket entry no. 13] is **GRANTED**.

**IT IS FURTHER ORDERED** that all defendants in this matter shall be dismissed with prejudice.

A separate final judgment in compliance with Rule 58 of the

Federal Rules of Civil Procedure will be entered.

**SO ORDERED**, this the 30th day of March 2009.

                                                  s/ David Bramlette

                                                  UNITED STATES DISTRICT JUDGE